UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA

FILED

DAVID W. D^···

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| ) | |
| IN RE: STUCCO LITIGATION    ) | Master File No. 5:96-CV-287-BR(2) |
| ) | |
| ) | |
| _____) | |

THIS DOCUMENT RELATES TO:

    ALL CASES


## SUPPLEMENTAL MEMORANDUM OPPOSING
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION


    Defendants Dryvit Systems, Inc., Parex, Inc. and Sto Corp. hereby submit this Supplemental

Memorandum Opposing Plaintiffs' Motion for Class Certification.

PARTIALLY
SCANNED

# TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Plaintiffs' Proposed Class Action and Class Representatives . . . . . . . . . . . . . . . . 1

    B.    The <u>Amchem</u> Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    Plaintiffs' Proposed Class Lacks Sufficient Unity and Cohesion for Absent Members to be Bound by Decisions of Class Representatives. . . . . . . . . . . . . . . . . . . . . . . . 7

        1.    Plaintiffs Have Reformulated Their Claims To the Detriment of Class Members in an Attempt to Gloss Over Predominance Concerns. . . . . . . 15

        2.    Given the Diversity of Plaintiffs' Proposed Class, A Judgment Binding On All Class Members Is Not Possible and Would be Unfair. . . . . . . . . . . . 19

        3.    Plaintiffs' Proposed Subclasses Exacerbate the Class Deficiencies. . . . . 21

    B.    Plaintiffs' Class Representatives Fail to Meet the Adequacy of Representation Requirements of Rule 23(a)(4) as Interpreted by <u>Amchem.</u> . . . . . . . . . . . . . . . . 22

III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

i

# TABLE OF AUTHORITIES

**Cases**                                                           **Page No.**

Breeden v. Richmond Community College, 171 F.R.D. 189, 202, n. 14 (M.D.N.C. 1997 . . . 7, 22

Amchem Products, Inc. v. Windsor, No. 96-270, 1997 WL 345149
    (U.S.Pa., June 25, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-9, 11-13, 27, 20, 26-29

Georgine v. Amchem Products, Inc., 83 F.3d 610, 626
    (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 18

Gilbane Building Co. v. Federal Reserve Bank of Richmond,
    80 F.3d 895, 903 (4th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Simpson v. Specialty Retail Concepts, Inc., 908 F. Supp. 323, 334
    (M.D.N.C. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Southern Ins. Co. v. Bennett, 680 F.Supp. 387,
    (M.D. Ga. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Strickland v. Town of Aberdeen, 124 N.C. App. 430 (1996) . . . . . . . . . . . . . . . . . . . . . . . 25


**Statutes**

Rules 23(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 7-12, 27

Rule 23(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-11, 17, 18

Rule 23(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Rule 23(c)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Rule 23(c)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 20, 24

Case 5:96-cv-00287-BR   Document 183   Filed 07/18/97   Page 3 of 31

I. **INTRODUCTION**

Presently, there are eight EIFS product liability cases pending before this Court pursuant to Multi-District Litigation transfer orders. Seven cases seek to proceed as class actions, and one involves claims of individual plaintiffs. A consolidated complaint was filed on April 30, 1996 and answered by Defendants Dryvit Systems, Inc., Parex, Inc. and Sto Corp. (hereinafter referred to as "Defendants") on May 20, 1996.

On September 30, 1996, Plaintiffs filed a motion for class certification, seeking to " represent a class consisting of all persons in the United States who have an ownership interest in a house or other residential structure with Exterior Insulation and Finish System ("EIFS") cladding manufactured and/or distributed by" any of the thirteen defendants named in the In Re Stucco Litigation, and installed between January 1, 1986 through December 31, 1995. Defendants filed their memorandum opposing Plaintiffs' motion on October 30, 1996, to which Plaintiffs responded with a reply memorandum dated December 6, 1996.

A. **Plaintiffs' Proposed Class Action and Class Representatives**

Plaintiffs assert that fourteen individuals are qualified to represent the interests of a class that they claim may exceed 200,000 persons[1] because each of the fourteen class representatives: (1) "owns a home in North Carolina upon which EIFS manufactured by one of the Defendants has been installed"; (2) has the same interest as do class members "in obtaining relief from the Defendants"; (3) has a home that has been inspected and found to have "unacceptably high amounts of moisture within the exterior walls" and has either already "experienced **or will experience** some degree of damage as a result of the failure of EIFS to drain water"(emphasis added); and (4) has brought

---

[1] Memorandum in Support of Plaintiffs' Motion for Class Certification, pp. 17, 12 ("Pltfs' Memo").

claims against the Defendants for negligence, unfair and deceptive trade practices and breach of implied warranty.[2]

In addition, Plaintiffs have proposed that the Court create the following five subclasses: (1) negligence subclass; (2) unfair and deceptive trade practices subclass; (3) implied warranty of fitness subclass; (4) express warranty subclass; and (5) punitive damages subclass.[3] Each of the subclasses excludes certain states and Plaintiffs claim that these are those states whose laws differ significantly with respect to the particular claim the subclass represents.[4] The result is that the subclasses encompass different, although overlapping, geographic areas with citizens of nineteen different states being excluded from one or more of these subclasses.[5]

B.     The Amchem Decision.

On June 25, 1997, the United States Supreme Court rendered its decision in Amchem Products, Inc. v. Windsor, No. 96-270, 1997 WL 345149 (U.S.Pa., June 25, 1997). Exhibit 1. Amchem, in addressing certification of a class action for purposes of settling asbestos claims, expounded in detail upon key concepts underlying class certification. Immediately thereafter, on June 27, the Supreme Court vacated and remanded a companion case also involving a class settlement of asbestos claims, Flanagan v. Ahearn, 90 F.3d 963 (5th Cir. 1996), to the appellate court

---

[2] Id. at 17. Plaintiffs' class representatives are not going to pursue, on a class-wide basis, claims for common-law fraud or for strict liability. Id., n. 11. Plaintiffs do not mention claims for express warranty in this context. Why these are omitted is a mystery.

[3] Plaintiffs' Motion for Class Certification.

[4] Id.; Pltfs' Memo, pp. 25-28.

[5] See Plaintiffs' Motion for Class Certification.

2

for further consideration in light of the Court's decision in Amchem. Flanagan v. Ahearn, 96-1379, 1997 WL 107188 (U.S. Texas, June 27, 1997).

In Amchem, the parties had filed a joint motion for conditional class certification that sought to achieve the settlement of current and future asbestos-related claims. 1997 WL 345149, at *6. The complaint, filed simultaneously with the proposed settlement agreement, identified nine plaintiffs who were to act as representatives of a class comprised of all individuals who had not yet filed asbestos-related lawsuits against the defendants but who had been exposed--or whose family members had been exposed--to asbestos. Id. Various state law claims for relief were asserted in the complaint. Id. at *7. In certifying the class under Rule 23(b)(3), the District Court found that the requirements of Rules 23(a)[6] and 23(b)(3)[7] had been met. Id. at *9. According to the District Court, the class met Rule 23's numerosity requirement, the claims of the class representatives were typical of the class as a whole, and the class settlement was superior to other forms of adjudication. Id. The District Court also observed that Rule 23(a)'s commonality requirement and Rule 23(b)(3)'s predominance requirement were satisfied since "[t]he members of the class have all been exposed to asbestos products supplied by the defendants and all share an interest in receiving prompt and fair compensation for their claims . . . ." Id. Furthermore, the District Court found that Rule 23(a)(4)'s

---

[6] Rule 23(a) requires that: (1) the class be "so numerous that joinder of all members is impracticable"; (2) there exist "questions of law or fact common to the class"; (3) "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class" as a whole; and (4) "the representative parties will fairly and adequately protect the interests of the class." Rule 23(a), Fed. R. Civ. P.

[7] Rule 23(b)(3) requires that the court find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3), Fed. R. Civ. P.

3

requirement of adequacy of representation by class representatives and class counsel was met since class representatives had "a strong interest that recovery for all of the medical categories be maximized because they may have claims in any, or several categories" and there was "no antagonism of interest between class members with various medical conditions or between persons with and without currently manifest asbestos impairment." Id. (quoting Georgine v. Amchem Products, Inc., 83 F.3d 610, 626 (3d Cir. 1996)). On appeal, the United States Court of Appeals for the Third Circuit vacated the certification, holding that the class did not meet the requirements of Rules 23(a) and 23(b)(3). Georgine, 83 F.3d 610.

The Supreme Court affirmed the Third Circuit's denial of certification, Amchem, 1997 WL 345149, at *10, essentially adopting the reasoning of that Court of Appeals. Directing its attention to Rule 23(b)(3)'s predominance requirement, the Supreme Court held that the predominance requirement was not met by the factors relied upon by the District Court. Id. at *18. The predominance inquiry is concerned with the legal or factual questions that qualify each class member's case as a genuine controversy. Id. While the fact that class members have all been exposed to asbestos products supplied by the defendants might suffice to met Rule 23(a)'s commonality requirement, Rule 23(b)(3)'s predominance requirement is substantially more demanding, and could not be met in light of the plaintiffs' differing histories, different type and extent of exposures, and different type and extent of injuries. Id. at *19. Thus, "[g]iven the greater number of questions peculiar to the several categories of class members, and to individuals within each category, and the significance of those uncommon questions, any overarching dispute about the health consequences of asbestos exposure cannot satisfy the Rule 23(b)(3) predominance standard." Id. at *19.

4

Turning to Rule 23(a)(4)'s adequacy of representation requirement, the Supreme Court stated that to serve as adequate class representatives, plaintiffs must have "the same interest and suffer the same injury as the class members" they represent. Id. at *20. In holding that this requirement was not met, the Court noted that in significant respects, the interests of the members of the class were not aligned. Id. For example, for those presently injured, the goal was to obtain large immediate payments, whereas the goal of exposure-only class members was to have an inflation protected future fund available. Id. Yet, despite the disparity between the currently injured and the exposure only members, and despite the diversity within each of these categories, the proposed class representatives sought to act on behalf of a single class, rather than on behalf of discrete subclasses. Id. Thus, there was no assurance that the class representatives served the aggregate and diverse interests of the class. Id. *21.

The Amchem Court noted that "As this case exemplifies, the rulemakers' prescriptions for class actions may be endangered by 'those who embrace [Rule 23] too enthusiastically just as [they are by] those who approach [the rule] with distaste." Id. at *21 (quoting C. Wright, Law of Federal Courts 508 (5th ed. 1994)). Although addressing the issue of class certification in a settlement context, the Superior Court's opinion in Amchem is not limited in its application or reasoning merely to settlement classes. Nor is the opinion limited to personal injury class actions as opposed to property damage class actions. To the contrary, Amchem's rationale and the principles enunciated therein apply with equal force to all requests for class certification including requests for certification for trial purposes in property damage actions. In specifying the prerequisites Plaintiffs must meet before a class action may be certified pursuant to Rules 23(a) and (b), the Court discussed these key concepts underlying class certifications:

5

1.      The "dominant concern" underlying Rules 23(a) and (b) is "whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives." 1997 WL 345149, at *17.

2.      Rule 23(b)(3)'s "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Id. at *18.

3.      "Even if Rule 23(a)'s commonality requirement may be satisfied by [the] shared experience" of exposure to allegedly harmful products supplied by the defendants, "the predominance criterion is far more demanding." Id. at *19.

4.      "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws. . . . Even mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement." Id. However, "when individual stakes are high and disparities among class members great" Rule 23(b)(3)'s predominance requirement demands caution. Id.

5.      A class whose members have been "exposed to different [] products [supplied by the defendants], for different amounts of time, in different ways, and over different periods[,]" and which consists of some class members with various types of present injuries and some class members suffering from exposure only, presents "disparate questions undermining class cohesion. . . ." Id. (quoting Georgine v. Amchem Products, Inc., 83 F.3d 610, 626 (3d Cir. 1996)).

6.      "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." 1997 WL 345149 at *20.

7.      "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." Id. (Internal citation omitted).

In short, the Amchem decision is relevant to all class certifications and its teachings clearly preclude certification of Plaintiffs' proposed class in this action for the reasons more fully articulated below.

6

II. ARGUMENT

   A. Plaintiffs' Proposed Class Lacks Sufficient Unity and Cohesion for Absent
      Members to be Bound by Decisions of Class Representatives

Plaintiffs, in their motion for class certification and supporting briefs, have already implicitly

conceded that the proposed class lacks sufficient unity to be fairly bound by decisions of class

representatives as to all issues pertinent to their claims. Plaintiffs seek to proceed as a class as to

some, but not all, issues pursuant to Rule 23(c)(4)(A)[8] and with respect to these issues they propose

to leave some class members out on one or more of the issues by requesting subclasses pursuant to

Rule 23(c)(4)(B). When scrutinized, these requests alone demonstrate the absence of the requisite

unity and cohesion for these actions to proceed as class actions at all.

In Amchem, the Court characterized "class unity so that absent members can fairly be

bound" as the "dominant concern" of Rules 23(a) and (b). Amchem, 1997 WL 345149, at *17. The

predominance inquiry "trains on the legal and factual questions that qualify each class member's

case as a genuine controversy ...." while focusing on "whether proposed classes are sufficiently

cohesive to warrant adjudication by representation." Id. at *18. The Court concluded that:

> Given the greater number of questions peculiar to the several
> categories of class members, and to individuals within each category,
> and the significance of those common questions, any overarching
> dispute about the health consequences of asbestos exposure cannot
> satisfy the Rule 23(b)(3) predominance standard.

Id. at *19. The Court then quoted the Third Circuit's description of the "disparate questions

undermining class cohesion" as follows:

---

[8] Plaintiffs' proposals for dealing with issues which are not certified for class treatment are
either vague or non-existent.

7

> Class members were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods. Some class members suffer no physical injury or have only asymptomatic pleural changes, while others suffer from lung cancer, disabling asbestosis, or from mesothelioma. . . . Each has a different history of cigarette smoking, a factor that complicates the causation inquiry. The [exposure-only] plaintiffs especially share little in common, either with each other or with the presently injured class members. It is unclear whether they will contract asbestos-related disease and, if so, what disease each will suffer. They will also incur different medical expenses because their monitoring and treatment will depend on singular circumstances and individual medical histories.

Id. Differences in state law served to "compound these disparities." Id.

The "shared experience"[9] of having a residence clad with EIFS cannot overcome the predominance criteria of Rule 23(a). Applying the law of Amchem, the disparate questions in this lawsuit undermine any class cohesion. A number of differences parallel those pointed out by the Amchem Court:

1. Differences in products used - Plaintiffs seek relief from different manufacturers, many of whom sold several different EIFS products.

2. Differences in the duration of time that these products have been in use by class members - Plaintiffs seek recovery for products installed over a ten year period.

3. A multitude of differences in location, extent and causes of damage - some claim damage only to isolated areas of their home, some only claim damage caused by water intrusion at as few as one window, some only claim damage caused by water intrusion at roof flashings, some only claim damage caused by water intrusion at deck flashing locations, some claim damage from water intrusion resulting from multiple causes, at multiple locations and in quantities substantially affecting their entire home, etc. (See e.g. Campbell Dep. pp. 25-26; Lukban Dep. p. 13; Entwistle Dep. p. 10; Pentz Dep. pp. 35-36.)

4. Differences in standing - some claim to have suffered actual property damage while some do not.

---

[9] The "shared experience" in Amchem was asbestos exposure. Id.

5. Differences in type of damage claimed - some claim rot has occurred, some claim only elevated moisture, and others only claim diminished market value due to risk of damage.

6. Different degrees of maintenance by homeowners (See e.g. Entwistle Dep. p. 10; Lamoureaux Dep. p. 15; Todd Dep. p. 40).

7. Differences in current situations - some have already incurred actual costs to reclad or repair while some have not (See e.g. Campbell Dep. pp. 25-26; Burton Dep. pp. 42-43; reclad Deloia Dep. pp. 23, 30) no reclad yet.

8. Differences with regard to applicable statutes of limitations and repose - some have no issue to face here while some do, state law issues that "compound the disparities").

Additional differences that make this proposed class even less cohesive than the Amchem case include:

a. Involvement of and causation of damage by third parties such as builders, roofers, product applicators, and window manufacturers;

b. Differences in compliance with manufacturers' instructions - some claim such instructions were followed while others claim they were not and the instructions themselves differ both over time and among manufacturers.

c. Differences in representations made at different times by different manufacturers to different class members.

d. Varying geographic influences on the issue of product performance.

These differences demonstrate the disparity in the legal and factual questions which must be addressed to fully resolve the claims of the various individual class members. Practical disparities affecting the prosecution of these claims and choices which claimants might want to make in the course of such prosecution are also revealing as to the lack of unity in the proposed class. These practical considerations are particularly revealing as to the interrelation between liability and damages claims. A few hypotheticals illustrate these practical disparities:

9

Hypothetical A -- consider a potential class member whose lack of flashing and kickouts have caused extensive damage to sheathing and structural elements affecting all elevations of the home. As an individual litigant, this class member will want to maximize the chances for recovery of the sheathing damage in addition to any recovery for the siding itself. The litigant will be concerned about the availability of insurance for property damage and will likely want to sue all parties involved in the construction of the exterior wall of the house including the general contractor in order to avoid "empty chairs" at trial. This potential litigant may choose to abandon uninsured claims such as fraud and unfair and deceptive trade practices or at least may choose to focus the individual litigation more heavily on breach of implied warranty and negligence claims which typically would be insured if actual property damage has resulted.

Hypothetical B -- a similarly situated potential class member whose EIFS was installed ten years ago in North Carolina. This second class member would likely adopt a different strategy in an effort to avoid a statute of repose defense. An effort would be made to prove that the manufacturer was a materialman under North Carolina law (an issue which is totally irrelevant to the first class member) and to prove fraud (a finding which could impair insurance coverage).

Bringing in the general contractor and other contractors who contributed to the water intrusion is even more important now since recovery can be had against them upon a showing of gross negligence even if claims against the EIFS manufacturer are barred. If such class member has recently purchased the home, he might also have a failure to disclose claim against the seller that could be pursued.

Hypothetical C -- a potential class member with no actual damage to sheathing and who can produce no evidence of actual moisture intrusion. This class member has much less chance of

10

obtaining an insured recovery. This class member also has difficulty with negligence and breach of warranty claims. As a result, the unfair and deceptive trade practice and fraud claims may become this class member's almost exclusive focus. Alternatively, this class member may conclude that it is premature to file suit, i.e. that his claim is really a future one or he might sue the EIFS manufacturer now and the general contractor later, or vice verse. Further, the marketing representations of the manufacturer of the EIFS on this class member's home have heightened importance to the class member's claim and variations among the representations by the different defendants may substantially affect the class member decisions.

Hypothetical D -- a class member has no rotten sheathing but does have some evidence of elevated moisture. For this class member, the scientific evidence relating to water and wood becomes critical in establishing an actual injury. In addition, the difference between a measure of damages which results in the elimination of the intruding water and one which results in replacement of the cladding on the home may not be of great significance to this class member.

Hypothetical E -- a class member has already reclad her home with another siding and seeks compensation for the costs incurred. This class member has a heightened interest in the measure of damages and in including in that measure all items for which costs have already been incurred.

Hypothetical F -- a class member has EIFS which has cracked because it was not installed with expansion joints. Water is entering through the cracks and the EIFS is coming loose from the house. This class member has almost no interest in focusing upon the absence of a drainage plane. With or without a drainage plane, this homeowner has a problem. This class member faces the formidable defense of intervening causation and would prefer to have the contractor present as a party.

11

Hypothetical G -- a class member lives in South Carolina (13 year statute of repose) near Calabash. His house is twelve years old--oops, he is not a class member.

Hypothetical H -- a class member has a sprinkler system that routinely wets her house. This class member hires an expert to render an opinion that the sprinkler system did not contribute to the damage on her home. Another class member does not have a sprinkler system and does not want to have anything to do with the claim of a class member who does have a sprinkler system since the jury might get confused.[10]

Hypothetical I -- a class member has a warranty from an EIFS manufacturer. The warranty might be standard with the product, requested by the original homeowner and specific to the home, or negotiated between the homeowner or builder and the manufacturer. Despite the North Carolina statute of repose, this class member may have a warranty claim although it would be subject to the warranty's terms including various limitations as to remedies. Depending upon the specific damage incurred and the specific warranty terms and limitations at issue, this class member may or may not want to assert that the warranty is unconscionable. The test of unconscionability will differ depending on the type of warranty and other individual facts related to his claim. Or, if the remedy meets his particular needs, the class member might want to avoid any attack on the warranty lest it be rescinded and lost altogether.

Hypothetical J -- a class member lives in the state of Washington and is similarly situated to the class member in Hypothetical A above. Unfortunately, the only claim which will be pursued

---

[10] All class representatives deposed to date have sprinkler systems. See Burton Dep. at p. 16; Coleman Dep. pp. 20-21; DeLoia Dep. p. 10; Entwistle Dep. p. 9; Lamoureaux Dep. p. 8; Lanning Dep. p. 11; Lukban Dep. p. 8; Schaal Dep. p. 9; Todd Dep. p. 12. (Deposition pages referenced herein are indexed and attached as Exhibit 3-13)

12

by these Plaintiffs on her behalf is an unfair trade practices claim.[11] This one claim approach likely does not meet the needs of this class member at all. If this Plaintiff were to proceed individually, she could pursue other claims.

Despite these disparities, Plaintiffs' assertion here is, essentially, that the predominance requirement is satisfied because all putative class members share the experience of homes clad with EIFS products manufactured by the Defendants, with class members consisting of both presently-injured members and members concerned about future injury. Similarly, in Amchem, the putative class representatives asserted that the predominance requirement was satisfied because, *inter alia*, all class members shared the experience of exposure to asbestos-containing products supplied to them by the defendants, although some members were presently injured while others had no notable injury but were concerned about future injury from such exposure. 1997 WL 345149, at *19. Amchem specifically rejected this commonality as sufficient for a finding of predominance. Id. Instead, the Court found that due to the large number of important " uncommon questions," that is, questions pertinent to particular categories of class members and to individuals within such categories, the common and "overarching" question about the consequences of exposure to asbestos was insufficient to meet Rule 23(b)(3)'s predominance requirement. Id.

In reaching this conclusion, the Supreme Court relied heavily on the Third Circuit's opinion in Georgine. The Third Circuit's observations in Georgine, although referring to the shared

---

[11] In Mayer v. Sto Corp., plaintiffs claimed that Sto. Corp. manufactured a flawed product that allowed water to become trapped inside the walls of their home and to damage the wood framing. A Washington jury found that Sto Corp.'s product was reasonably safe as designed, was accompanied by adequate installation instructions and warnings, and did not violate Washington's consumer protection laws (the Washington nearest counterpart to North Carolina's unfair trade practices statute).

13

experience of exposure to asbestos as opposed to the shared experience of "exposure" to EIFS[12], are particularly instructive and are equally applicable to the case at bar. Initially, the Third Circuit recognized that there may be several questions common to the class, such as whether asbestos causes injury, whether the defendants had knowledge of the hazards of asbestos, whether the defendants adequately tested their asbestos products, and whether the warnings accompanying their products were adequate. 83 F. 3d at 626. However, after a discussion of the widely varying character of plaintiffs' claims, the Court went on to state:

> *These factual differences translate into significant legal differences. Differences in amount of exposure and nexus between exposure and injury lead to disparate applications of legal rules, including matters of causation, comparative fault, and the types of damages available to each plaintiff. Furthermore, because we must apply an individualized choice of law analysis to each plaintiff's claim . . . the proliferation of disparate factual and legal issues is compounded exponentially.* The states have different rules governing the whole range of issues raised by the Plaintiffs' claims: [ ], causation; the type of proof necessary to prove asbestos exposure; statutes of limitations; joint and several liability; and comparative/contributory negligence.

83 F.3d at 626-27. (Emphasis added). Thus, even if there were common issues to the class beyond the harmfulness of asbestos exposure (or EIFS exposure here), the "multiplicity of individualized factual and legal issues, magnified by choice of law considerations," prevented the Court from holding that common questions predominated, as required by Rule 23(b)(3) for class certification. Id. The same type of morass of issues is presented here and the same result should occur.

---

[12] The term "exposure" is used loosely here, for the purpose of analogy, and should not be read to concede that long-term use of EIFS is in any way detrimental to those who use the product.

14

1. Plaintiffs Have Reformulated Their Claims To the Detriment of Class Members in an Attempt to Gloss Over Predominance Concerns

Plaintiffs have not blindly ignored these disparities among the class members. Instead, they seek to "work around them" by reformulating and narrowing the claims set forth in their Complaint. The result is a dilution of the claims asserted in order to obtain class certification -- a dilution which is especially significant in that these compromises may well preclude class plaintiffs from pursuing claims against other tortfeasors who also face liability for their roles in building any defective EIFS homes. Such compromise of claims in order to obtain class certification is one danger of embracing Rule 23 "too enthusiastically" which concerned the Court in Amchem. 1997 WL 345149, at * 21.

Plaintiffs state that their claims primarily require resolution of only one "overarching question[13] - did Defendants negligently fail to incorporate a drainage system into their EIFS products."[14] Plaintiffs go on to state:

> Answering this question requires resolution of whether Defendants knew or should have known that water infiltration behind EIFS was foreseeable and inevitable, whether water infiltration causes damage to homes like those of the plaintiffs and whether water damage could have been avoided by incorporation of a drainage system into the EIFS system. These are common questions that each class member must prove if suing individually and these questions overwhelm any individual questions necessary to the resolution of these claims.[15]

---

[13] "Overarching" disputes are not unfamiliar to the federal courts. In Amchem, the Court addressed the "overarching dispute about the health consequences of asbestos exposure" but found the dispute inadequate to meet Rule 23's requirements. 1997 WL 345149, at *19.

[14] Reply Memorandum in Response to Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification, p. 1 ("Pltfs' Reply Memo").

[15] Id.

15

Then, Plaintiffs present a proposed trial plan[16] listing the following "seven common threshold issues" to be addressed in a single trial phase:

1.    Was the Defendants' EIFS negligently designed by failing to include a drainage plane?

    (a)    If the answer to Issue 1 (negligence) is "yes", are the defendants' 100% responsible for the injury?

    (b)    If the answer is "no" to Issue 1(a), then the court will use special interrogatories to deal with state law variations in comparative negligence.

2.    Has EIFS caused or will it cause harm to Class members' homes?

3.    Has EIFS caused a diminution of value to Class members' homes?

4.    Did Defendants breach any express warranties?

5.    Did Defendants breach any implied warranties?

6.    Did Defendants engage in unfair or deceptive trade practices?

7.    Are Defendants liable for punitive damages?[17]

Plaintiffs' purpose in formulating their case in this manner is expressly articulated as an effort to ask the jury "to determine whether the lack of a drainage plane was the sole legal cause of the injuries suffered by class members."[18] By taking this approach to their case, Plaintiffs claim that the conduct of third parties is rendered irrelevant and differences in state law--particularly with regard to comparative fault--are either rendered irrelevant or at least manageable. However, even

---

[16] Pltfs' Reply Memo, Exhibit 1.

[17] Implicit in this formulation of the issues is a singular focus by Plaintiffs on the "[failure] to include a drainage plane" to the exclusion of a variety of other factual allegations in their Complaint.

[18] Pltfs' Reply Memo, p.4.

in addressing the drainage plane issue, Plaintiffs must address and the jury must consider the conduct of third parties. For example, as Plaintiffs themselves state, one issue will be whether water infiltration behind EIFS was foreseeable and inevitable. This necessarily includes an examination of the conduct of contractors, applicators and others in order to assess the foreseeability of misapplication failure to follow instructions, or likely entry of water in material quantity.

To package their case in this manner, Plaintiffs have had to make substantial sacrifices, essentially abandoning several of their claims. For instance, Plaintiffs expressly do not seek class certification for fraud claims in order to avoid the consequences of the disparate "reliance" claims of the various proposed class members and class representatives. However, Plaintiffs ignore the fact that "reliance" issues also pervade their claims of unfair and deceptive trade practices, and negligent misrepresentation. See Gilbane Building Co. v. Federal Reserve Bank of Richmond, 80 F.3d 895, 903 (4th Cir. 1996) (No North Carolina cases have permitted recovery for unfair and deceptive trade practices without reliance); Breeden v. Richmond Community College, 171 F.R.D. 189, 202, n. 14 (M.D.N.C. 1997) (an essential element of both fraud and negligent representation claims is reliance on the false statement by the plaintiff); Simpson v. Specialty Retail Concepts, Inc., 908 F. Supp. 323, 334 (M.D.N.C. 1995) (Negligent misrepresentation under North Carolina law requires justifiable reliance by plaintiff). Further, Plaintiffs have abandoned their strict liability count, most of their negligence count, and their count for declaratory and injunctive relief.[19] Plaintiffs abandon claims in their Complaint that EIFS itself "allows for moisture intrusion into the structure and foundation of the homes" and that "EIFS will fail and allow moisture intrusion" including factual claims about base coat thickness, use of sealants, vapor condensation, deterioration

---

[19] Complaint, Counts VI, VII, and VIII.

17

of the EIFS itself as a result of water intrusion, etc.[20] Plaintiffs have not included in their requests for recovery builders, applicators, flashing contractors, sealant contractors, window installers, window manufacturers or others whose conduct resulted in water intrusion on their homes. Plaintiffs further have abandoned[21] claims as to inadequate installation instructions and failure to train and supervise applicators. Finally, Plaintiffs have completely reformulated the supposed common issues from those stated in their Complaint.[22]

In short, Plaintiffs attempt to restructure and recharacterize their claims to maximize their opportunities to obtain class certification. By contrast, virtually all other class members who have asserted claims relating to water intrusion on their EIFS clad homes have structured their claims to maximize the potential for actual relief for their claimed injuries. See Exhibit 2 (sample captions from EIFS cases pending in North Carolina, all of which involve third parties such as builders, applicators, window manufacturers, and other subcontractors). With virtually no exceptions, individual homeowners who are pursuing actions to recover for damage to their specific homes

---

[20] Complaint, ¶ 45.

[21] Admittedly, the use of the term "abandoned" in this paragraph may be a bit strong. Plaintiffs cleverly phrase their motion and brief to avoid expressly abandoning anything. Yet, this cleverness amplifies and foreshadows Defendants' point. If these claims have not been abandoned, how can a judgment here bind the entire class? See Rule 23(c)(3) ("The judgment in an action maintained as a class action under subdivision (b)(3), whether or not favorable to the class, shall include . . . [those] whom the court finds to be members of the class.") See also infra, Section II(A)(2). If the claims have been abandoned, who are Plaintiffs to make this decision for the entire class and its individual members?

[22] Complaint, ¶ 65.

18

include claims against a variety of parties or focus their claims on their general contractor who in turn typically asserts third party claims against various other potentially responsible parties.[23]

Homeowners pursuing individual lawsuits do not have the need to torturously reformulate and water down their liability claims in an effort to obtain class certification. When so many potential class members choose such a different path in pursuing their own individual claims, it is hard to fathom how anyone could conclude that there is "unity" between the class members or at least between the class members and the Plaintiffs who propose to represent the class here.

### 2. Given the Diversity of Plaintiffs' Proposed Class, A Judgment Binding On All Class Members Is Not Possible and Would be Unfair

The impact of the reformulated claims and trial plan proposed by Plaintiffs is the de facto revival of the "spurious" class action. This approach was discarded by the 1966 revisions to Rule 23 which revisions provided that judgments rendered in class actions are binding on the class regardless of whether such judgments are favorable or adverse.[24] Given all the claims for which Plaintiffs do not seek class treatment and all of the class members who are excluded from one or more of the various subclasses, it is difficult to comprehend how a judgment in this proposed class action adverse to Plaintiffs could fairly bind all class members. Plaintiffs completely fail to address this dilemma.

---

[23] In the meantime, while this action is pending, the statute of limitations is running on claims the potential class members have against their builders, although at least two of the named Plaintiffs in the case at bar are pursuing separate actions against their builder and EIFS applicator (Todd Dep. pp. 29-32, 38; Coleman Dep. p. 35). Plaintiffs' class counsel, Gary Shipman, when representing individual EIFS homeowners, brings suit against the general contractors of the residence. (See e.g. Wain v. D.I. Logan d/b/a Logan Constr. Co., New Hanover County Superior Court, 97 CVS 859; Sanderson v. Kent Homes, New Hanover County Superior Court, 97 CVS 1383.

[24] See Rule 23(c)(3); Adv. Comm. Notes, 28 U.S.C.A., p. 383.

Perhaps Plaintiffs contemplate that a binding declaratory judgment would be entered in favor of the Defendants on the "drainage plane" issues that they present and each class member would then proceed to individually pursue other theories of recovery. Such an approach would be a clear misuse of a declaratory judgment. See Southern Ins. Co. v. Bennett, 680 F.Supp. 387, (M.D. Ga. 1988) ("a claim based upon negligent or intentional acts is not appropriate for a decision in a declaratory judgment action,"); Strickland v. Town of Aberdeen, 124 N.C. App. 430 (1996) (a negligence action with unresolved issues of fact [such as issues as to injury] cannot be properly decided under North Carolina's Declaratory Judgment Act). Moreover, it would hardly avoid duplicative litigation and would eliminate almost none of the evidence which would be presented in individual suits.

Even if phase I of Plaintiffs' trial plan results in favorable verdicts, Plaintiffs' plan to skip directly to a global damages phase is flawed. By ignoring "specific causation" issues, Plaintiffs risk binding the entire class and Defendants in a way which is unfair and unworkable. For example, assume for the sake of argument that Plaintiffs succeed in convincing the Court that they are entitled to removal of all existing EIFS due to the absence of a drainage plane, recladding with a siding installed with a drainage plane, and replacement of damaged sheathing and structural elements when such damage resulted due to the absence of a drainage plane. How can a judgment be entered relating to the sheathing and structural elements without first addressing whether each observed area of damage was specifically caused by the absence of a drainage plane? In other words, if the drainage plane was installed, would it have made any difference in the amount of damage given the quantity of water intruding at that particular location? Moreover, how can a class member recover at all without first demonstrating that the absence of a drainage plane has in fact caused specific

20

damage to sheathing or structural elements? Plaintiffs' plan is at best a proposal for piecemeal judgments which fails to clearly map out a course to a final conclusion.

        3.        <u>Plaintiffs' Proposed Subclasses Exacerbate the Class Deficiencies.</u>

In a purported effort to solve the problems of class disparities, Plaintiffs propose five subclasses: (1) a negligence subclass; (2) a breach of implied warranty subclass; (3) a breach of express warranty subclass; (4) an unfair trade practices subclass; and (5) a punitive damages subclass. This proposal does not even purport to address any of the disparities save one -- differences in state law. Even then, Plaintiffs' proposal fails to adequately address the differences in state law presented by the proposed sprawling national class.

The first fundamental flaw in Plaintiffs' subclass plan is the exclusion of citizens of various states from one or more of the claims Plaintiffs seek to pursue. Citizens of nineteen different states are excluded from one or more of the subclasses. Plaintiffs make no proposal as to how the excluded claims of these class members are to be addressed.

The second fundamental flaw in Plaintiffs' subclass plan is their failure to fully address the law of the fifty states. Plaintiffs' approach instead is to acknowledge a few deficiencies and then to claim that more subclasses can be created if other differences in law are discovered. Plaintiffs make the same proposal with regard to differences among the Defendant manufacturers. Plaintiffs generally gloss over differences in defenses such as statutes of limitations and repose, applications of the economic loss rule, and application of principles of intervening cause and comparative fault (critical here because the product is installed by third parties and the alleged "defect" is interwoven with fault of others). Further, the law of implied warranty differs markedly by state. Even greater variation is found as to the law of punitive damages. Plainly, this is one of the dangers the <u>Amchem</u>

21

Court foresaw in reversing the trial court's certification of a class which is, for all practical purposes, of the same type as the class urged here by the Plaintiffs.

The problem thus presented is that the Court is faced with "multiplication," not "addition." The creation of each new subclass of a given type actually results in creation of many more such subclasses. The five subclasses expressly proposed by Plaintiffs multiplied by subclasses for each Defendant alone results in approximately fifty subclasses. Once additional subclasses are created to address factual disparities among the class members and differences in state choice of law rules and in state law on various defenses asserted, the subclass multiplication quickly becomes mind-numbing.

      B.    <u>Plaintiffs' Class Representatives Fail to Meet the Adequacy of Representation Requirement of Rule 23(a)(4) As Interpreted by Amchem.</u>

Plaintiffs' proposed subclasses also vividly illustrate the inadequacy of Plaintiffs as class representatives. Plaintiffs have designated fourteen individual Plaintiffs to act as representatives of the interests of the entire class. Each Plaintiff is proposed as a representative of each subclass. Significantly, Plaintiffs provide the Court with essentially no facts upon which the Court can properly determine whether, as required by <u>Amchem</u>, each class representative "possess[es] the same interest and suffer[e]d the same injury" as the class members and subclass member he or she seeks to represent. <u>See</u> <u>Amchem</u>, 1997 WL 345149, at *20. Without being privy to more information regarding these class representatives than the bare bones outline provided by Plaintiffs, this Court cannot reasonably conclude that the named Plaintiffs have interests that align with those of absent class members.

Certainly each class representative's legal claims and the factual circumstances upon which such claims arose need not be identical in every respect to the members of the class whom they

Case 5:96-cv-00287-BR   Document 183   Filed 07/18/97   Page 25 of 31

represent. However, in light of <u>Amchem</u>'s requirement that a class representative share the same interest and the same injury as the class members he seeks to represent, Plaintiffs' proposed nationwide class action must fail. With class members of such diverse interests and injuries, the class representatives in this case cannot, just like in <u>Amchem</u>, fairly and adequately represent all class members.

The Court in <u>Amchem</u> rejected the proposed class representatives as inadequate because "[I]n significant respects the interests of those within the single class are not aligned." <u>Id</u>. at *20. The Court found an absence of "structural assurance of fair and adequate representation for the diverse groups and individuals affected." Ultimately, the Court concluded that it had "no assurance . . . that the named plaintiffs operated under a proper understanding of their representational responsibilities." 1997 WL 345149, at *21. There is no such assurance here either.

Implicit in the Court's analysis is a requirement that each separate subclass have at least one representative, with that representative pursuing only the interests of his or her subclass. No such representation is proposed here. In fact, the current named plaintiffs simply cannot adequately represent these subclasses either collectively or individually. The conflicts among the subclasses proposed only become "real" to the class representative when his or her own claim is affected. The class representatives proposed here all own homes in North Carolina and the formulation of subclasses does not exclude any of their claims. Therefore, the impact felt by the citizens of the nineteen states who have one or more claims excluded is not "real" to these North Carolina homeowners. Thus, none of the North Carolina homeowners, at least without additional representation from several, or all, of the nineteen potentially excluded states, are adequate subclass

23

representatives. Plaintiffs have completely ignored the inadequacy of the named plaintiffs as class representatives for the subclasses they propose.

They also have ignored the fact that as subclasses multiply, each subclass will need a class representative uniquely positioned to represent the numbers of the subclass. The inadequacy of the current class representatives is fatal to Plaintiffs' request for class certification. The daunting prospect of finding adequate class representatives for additional subclasses which likely will need to be created is equally fatal.

In summary, in <u>Amchem</u>, class representatives could not adequately advance the interests of all class members due to the diversity of medical conditions in the class, including those members with present injuries and members with exposure-only concerns and the potential for unknown future injuries. As is evident from the foregoing, Plaintiffs' proposed class here suffers from the same diversity of injuries and of interests which led the <u>Amchem</u> Court to hold that the requirements for class certification in that case were not met. Plaintiffs' motion for class certification should be denied.

III. <u>CONCLUSION</u>

Based on the Supreme Court's decision in <u>Amchem Products, Inc. v. Windsor</u> and for the reasons discussed above, Defendants respectfully request that Plaintiffs' Motion for Class Certification be denied in its entirety.

24

This the 18th day of July, 1997.

Robert E. Fields III, NCSB: 12946
Jerry S. Alvis, NCSB: 82
W. Andrew Copenhaver, NCSB: 944
Mary S. Pollard, NCSB: 20081
Christine Sandez, NCSB: 23531
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
Post Office Box 831
Raleigh, NC 27602
(919) 755-2100

Attorneys for Defendants Dryvit Systems, Inc.,
Parex, Inc. and Sto Corp., and Defendants' Liaison
Counsel

25

## CERTIFICATE OF SERVICE

On this 18th day of July, 1997, undersigned counsel, on behalf of Defendants, hereby certifies that he has personally served a copy of the foregoing **SUPPLEMENTAL MEMORANDUM OPPOSING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** on the following persons by United States Mail, first class, postage prepaid unless otherwise noted.

Charles F. Blanchard, Liaison Counsel
Blanchard, Jenkins & Miller, P.A.
3600 Glenwood Avenue
Suite 103
Raleigh, North Carolina 27612

Robert E. Fields III, NCSB: 12946

R#0222680.04

## INDEX OF EXHIBITS 3 - 13

1. *AMCHEM Products, Inc., et al., Petitioners v. George WINDSOR, et al* (Cite as: 1997 WL 345149 (U.S. Pa)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 1

2. Sample Captions of EIFS Litigation Pending in State Courts . . . . . . . . . . . . . . Exhibit 2

3. Deposition of Leora Burton . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 3

4. Deposition of Richard C. Campbell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 4

5. Deposition of Michael D. Coleman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 5

6. Deposition of Anthony DeLoia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 6

7. Deposition of Jack Entwistle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 7

8. Deposition of William Lamoureux . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 8

9. Deposition of Raymond Lanning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 9

10. Deposition of Leni Lukban . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 10

11. Deposition of Robert K. Pentz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 11

12. Deposition of William L. Schaal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 12

13. Deposition of Thomas Todd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 13

R#0223435.01

# NOTE:

This Is Only A Partially Scanned Document.

Please See Case File For Attachments,
Exhibits, Affidavits, Or Other Material Which
Has Not Been Scanned